The next case will be 085042 Phillips Company LMA Phillips Company of the United States. Pardon? May it please the court. The question in this case is whether the court of federal claims correctly held that it was bound by this court's decision in hash to hold the United States liable for a taking. Even though the question of liability was not briefed, issued, or decided in the district court in hash, presented, briefed, or argued in the court of appeals in hash, and the hash opinion contained none of the analysis required by this court's precedent to hold the United States liable for a taking. If the ownership has been settled, and the use is no longer for railroad use, which was what the, what had been originally provided for on the easement, and they switch to trails, isn't that an abandonment? What else needs to be decided? First of all, the question of the scope of the 1875 act easements was not before the court in hash and was not decided. By scope you mean railroad use versus other use? Yes. Isn't it clear it was to the railroad? No. What else do railroads do? No, no. Actually, we would appreciate the opportunity to present these arguments. These are the kinds of arguments that I'm going to talk about now that we have not been able to get a court to consider, which we need to have a court consider, and should not be done in the first instance on appeal of a case where we never were able to get consideration. But I asked the question, and you're telling me how much you wanted to answer the question, but you're not answering it. Yes. If you look at the language of the 1875 act, it has a broad grant of right of way. It's not limited to, it just says grants the right of way to the railroad or something. It doesn't say it's limited to railroad purposes. What else do railroads do other than run a railroad? The language is very similar to the language in the easement issue in the Chevy Chase case, which this court held was not limited to a railroad right of way. And federal law has provided with respect to the 1875 act easements that you don't read a limitation. Chevy Chase, we sent a certified question to the Supreme Court, or the Court of Appeals of Maryland to get a statement on the state law aspect. That doesn't really answer Judge Lurie's question. Well, it answers the question that it requires an interpretation of the statute. Let me ask the same question. What besides running railroads, running trains on tracks, what is it beyond that that we're talking about? We believe that Congress granted a right of passage. And that the right of passage was flexible for other transportation uses. You mean bicycles are roughly the same thing as railroads? They aren't necessarily roughly the same thing, but they are, as in the Chevy Chase, it interpreted a similar language. And interpreted that it's a broad right of passage that allows for the type of use to shift over time, depending on whether the burden is greater or less. As long as the burden isn't greater than what was before. Here, another aspect that wasn't addressed in Hash was that the question of trail use is part of the analysis. There's also the question of rail banking use. Rail banking use more obviously would be within the scope of the easement granted by Congress, especially at the time, you could tell that later on, at the time that Congress provided for a requirement that if a railroad wanted to abandon or discontinue use, it had to. Let me ask you, this is just so that I understand the end of the argument here. Assume for the moment that there, as you would argue if this case went back to the Court of Federal Claims, assume for the moment that it was determined that uses other than just railroad were contemplated in the 1875 grant, so that your scope was broader than just railroad. I'm just trying to think, what is the practical effect of that? How does that impact whether there's a taking exactly? Assume for the moment it was determined. I've always had a little bit of a problem understanding that concept, I'll be honest with you. Not your argument, but that whole situation is a difficult one. If you have a broad scope, how that impacts the taking. Assume you had a broad scope here. Since the land has gone back, why would that mean, why would that protect the government in a taking situation? I'm sort of fumbling around, do you understand my question? I think I do, but I think the premise is that you've assumed that there was abandonment first, and then you're asking whether, because you said the land had gone back. Assume for the moment that we start from the premise, we just take what everyone agrees Hatch decided was that there was a reversionary interest in the land owners. Then you get into an analysis, you'd say you'd have to get into an analysis of the scope, right? Assume you came in with a broad scope, what would the practical result of that be? If the scope includes trail use, then trail use is within the scope of the easement and there's no taking. Okay, trail use is in the scope of the easement, right? Right. If that was the case. But the easement's ended. No, the easement hasn't ended. That's right, it's banked. Right, it is rail banked, and actually, so the question, what's interesting here was that the language... What do you mean rail banked? It has been held in some way so that if the railroad ever resumes use for railroad purposes, it's still there? Yes, yes. But let me talk a little bit about abandonment, maybe, because the language in Hatch focuses on abandonment. There is a statement of abandonment in that last paragraph that finishes the category one discussion. There is a reference to abandonment that seems to assume that there has been abandonment, but that is incorrect. I mean, if abandonment occurs just because an easement goes through the regulatory abandonment process, which is abandonment of service, not abandonment of a right-of-way, then that would be contrary to the statements of this court and the statements of the Supreme Court in Prusso that said an easement isn't necessarily... Just so I understand, Stan, this rail banking process, you obviously live in the metropolitan area, right? Right. And you've read in the papers about the Purple Line, that whole thing? Yes, I know about the Purple Line. If they put the Purple Line on that strip that was involved in Chevy Chase, namely through the Columbia Country Club, right? Would that be an example of showing how rail banking operates? Yes, I believe so. I'm just trying to understand that. Rail banking, basically, it's a way of allowing a railroad prior to the change in the statute. Even if they use buses? Even if they... Well, highway use is contemplated within the scope of the easements anyway. So, I mean, I guess the language, I'm not so familiar with what it takes to bring rail use back, but there is a requirement that while the trail use is going on, the trail entity must allow... It doesn't have any choice. If rail use is coming back, then the trail group is out. I don't really know what happens with... What's rail banking? Is it an accounting concept? No, no. Would you keep this mentally or even on our books in reserve for future rail use? In a sense, yes. Yes, it is preserved. It's still within the Surface Transportation Board's jurisdiction. It's preserved unless it was abandoned. Well, it is actually preserved under federal law, preemptive federal law. The question for the takings case is whether we have to pay for that preservation. But it's definitely preserved and it is a preemptive law. But if something comes under the Rails to Trails Act, as I understand it, it's leaving aside what abandonment there may have been by a railroad, which may or may not have taken place, but just when something comes under the Rails to Trails Act, that itself can't be an abandonment, right? That's correct. That in and of itself is not an abandonment. That is a procedure that the STB has for what's called abandonment of a rail line, but, in fact, what happens is that basically the railroad that wants to discontinue use has a way of not being liable for the right-of-way while the use is discontinued and it's allowed to be used for trail use and then the railroad can come back in. Ms. Cooper, do you want to save your rebuttal time? Yes. Let me just point out that these are very complicated questions.  That's true, Mr. Allen. That's all in your brief. Most of your brief is talking about how complicated it is. Well, we're looking for some of the answers as well. Okay. Thank you. My name is Joe J. Allen. I'm from Telluride, Colorado. With me at council table is Cecilia Fex, who has participated in a great deal of this jurisprudence. I want to start with the point Judge Laurie was suggesting, and that is what is rail banking? Rail banking in the Trails Act is one of the most profound things that at least I can think of in more than 40 years of law practice that the Congress has done. It is something that a private party could not do. Have you been reading about the stimulus package? Well, I have been, but there isn't anything in the stimulus package that I've seen so far that violates the rule against perpetuities, and rail banking does. The private party could not do that. So from the standpoint of my clients, for example, who are landowners in a narrow mountain valley about 12 miles downstream from Aspen, this is a really profound thing. This is a permanent reservation of land on which they've paid taxes for 80 years, on which they continue to pay taxes, that is set aside for the potential that at some point in the future, which could be hundreds of years from now. Are there questions of fact, abandonment, scope that need to be dealt with on remand? No. No. And the reason they don't... Because hash really didn't go into them. No, and here's why. The administrative action by the Surface Transportation Board of issuing a notice of interim trail use is a trigger to the landowner's right to seek compensation. That's the point at which we have a bright line where we can see that, all right, now what would have otherwise been your right to use this land as the fee owner? You're being the fee owner, right? The fee owner. Okay. I think the beginning of Judge Plager's very good opinion in Preso 2, where he talks about whether or not we're talking about a reversion. These aren't really reversions. This is being disencumbered of a use right. Are there questions of state law that need to be looked into? Not with regard to 1875 Act rights of way. This is truly an area where Erie versus Tompkins does not apply. All of these have the same granting clause. It's as though the same deed were issued to every single holder of an easement. But Preso said you had to go back to Vermont law for certain. That's because Preso did not involve an 1875 Act right of way. Preso involved a right of way which was created as a matter of private contract to the Rutland and Canadian Railroad or whatever it was. It's on the eastern bank of Lake Champlain just below Burlington, Vermont. That was a privately created easement. All of the cases that are hash one category cases, including our case, are cases which have exactly the same documentary foundation. They are all homesteads. The patent to all of this land will be homesteaded land. These are all public lands. The 1875 Act didn't apply to anything other than public lands. Let me ask you, though, you're correct. The starting point is the 1875 Act here. It is a different situation in Preso. But isn't the result of what you're saying is that our decision in hash, which really I think had a very complete and thorough discussion of the reversion and the fee interest but didn't talk at all about takings principles, wouldn't the result be that that case, which had no discussion of taking principles or anything on liability, would control all of these cases? Yes, absolutely. But there's no discussion in it. There are some difficult questions here. And if it goes back, you may well prevail. Maybe the government would prevail. But shouldn't there be an airing of all of this in the Court of Federal Claims? I don't see how we can just go on the basis of the hash decision. It seems to me that if one looks at Judge Newman's opinion in hash as maybe, if you will, putting the final block in to construct the arch, and if we say that the arch is made up of Preso 1, that's the Brennan-O'Connor opinion in the Supreme Court in 1990, then we move on to Preso 2 in this circuit, where essentially all of these principles are laid out except for how they would operate with regard to the 1875 Act. None of these cases reached an 1875 Act right of way until hash. Hash is the first of the 1875 Act. Well, hash takes us to the first step. Through the first step, I think, there's no question. But, Your Honor, with all due respect, there aren't any other steps. And let me explain why. The kind of case-by-case analysis which Justices Brennan and O'Connor foresaw in Preso, when it reaches 1875 Act, reaches a broad number of parcels all over the place, almost all in the western United States. That's where the Homestead Act applied. All of which have the same kind of land patent, patents from the United States. In our case, the patent was, contrary to the Justice Department briefing, was actually the entry was 1914. The patent was 1923 or 1924, signed by Calvin Coolidge. And land vested as of the end. What did he say about Coolidge? He signed the patent. Oh, oh, oh. President Coolidge signed the patent to Joseph DeMos. Late in 1923. In 1923 or 1924. But all of the landowners are similarly situated in that they all are claimants under the original patentee. If they're not, they don't have standing. So you would need a fact analysis to determine, does this person have a chain of title which goes back to the Homestead Patent? But your opponent is saying the 1875 Act needs to be construed. Did the easement extend to use as trails of bicycles? And was there an abandonment? She says there are all sorts of questions that haven't been answered yet. Well, first, I reject the notion that the questions are not answered, but I would suggest this. All of those questions, to the extent they exist, are going to be the same with regard to all of these parcels because the granting clause, the grant of the easement, is the 1875 Act itself. Well, that may be the case. It may well be that at the end of the day that's the case, Mr. Allen. But doesn't it have to have a ventilation of that issue in the first instance in the Court of Federal Claims? And then whichever side loses there can come up here and appeal. I mean, you make the argument in your brief kind of getting to the merits that they couldn't have contemplated in the 1875 Act the use of bicycles and subsequent events. I enjoyed reading the brief. It was very evocative, references to the grant administration and stuff like that. And you may well be correct at the end of the day. I can't say. But, I mean, I just think the issue has to be aired. Well, if you look at what happened in this court in Teves, for example, in 2004 where this court rejected the notion that California's concept of shifting use could shift a use as far as from a transportation corridor to a recreation corridor. This court rejected that. The Supreme Court rejected that in Presell 1, if you look particularly at the O'Connor concurrence in Presell 1. And I think we also need to take a close look at the specific language of the 1875 Act. Can I ask this, though, just one question because your time is just about – well, no, you've got plenty of time, I guess. But what about the fact that it was helpful, the parties, you and Ms. Barton included in the appendix, the briefs from Hash 2. And in going through there, you know, it was a very narrowly focused issue. And, again, you may well prevail, but it does seem that the government should have a chance to make some of these arguments. Are you saying that as a matter of law, an easement to a railroad company is for railroad use and, therefore, as a matter of law, when it went to another different kind of use, it was an abandonment? That's right. I don't think we need abandonment. The real issue is whether or not there's a frustration of enjoyment of the use of the fee. It's not abandonment dependent. The Congress in the Trails Act said these rights of way are deemed not abandoned. So they've taken away abandonment. But let's ask ourselves where we would wind up if we go down the road that justice wants to go down. Where we would wind up would be to do exactly what Justice O'Connor said we cannot do, which would be to read the Just Compensation Clause right out of this process. Because the constitutionality of – Well, then we're fine. Then we're fine. But we have to get to that stage. Our position is we should go back to the Court of Federal Claims for damages only. But let me, if you will, just walk us through this analysis. If there can be a taking of this right, which was vested for my clients in 1914 when there was entry on the land, for a frustration of their use of the land. So now this land is forever set aside as a recreation preserve or for potential future rail use. And we now have 20 years of understanding of the Trails Act. And out of about 11,000 miles that have gone to recreational trails, only 10 or 11 miles have actually come back to rail use. So let's not kid ourselves. These are recreational preserves. It's an interesting point that some have gone back to rail use. A very, very few. A very, very few. What's that, 0.1%? Yeah, it's inconsequential. And that's to avoid the cost of acquisition of a corridor at some future point, which really stands our notion of just compensation for condemnation on its head to say that we can come back 10 years from now, 20, 100 years from now, and go back to this. But the very constitutionality of the Trails Act depends upon compensating the landowner for a taking. If ultimately the government can prevail on a position that no matter what use is made of this corridor, so long as something is moving on it that has wheels, I guess, or is walking, or a horse, so long as the movement of people on the corridor, that's consistent with the 1875 Act, then there won't be compensation for the frustration of use of the fee land, free of the easement. You're saying we should just look at the government's argument that it wants to make in the Court of Federal Claims and say that as a matter of law that argument cannot prevail. That's right. That's right. It can't. It cannot for the same reason that similar arguments have been rejected as to who owns this fee interest. You go back to the Great Northern case in 1942. The Supreme Court said that the 1875 Act did not give the railroad company a right to the minerals. The minerals belonged to the fee owner in the case not cited in the briefs but was cited in the Great Northern case in Shanky versus the Great Northern or Northern Pacific in 1923. The Supreme Court talked about how limited the 1875 Act grants were in the Leo Sheep Company, which involved the Union Pacific Act. Justice Rehnquist has a wonderful exposition of why the Union Pacific Act did not create an implicit grant of a lot of rights of way along the section lines of the checkerboard grant in the Union Pacific Act. So if we look at the whole development of this jurisprudence, it is a development which recognizes over and over and over the paramount character of the Homestead Grant. The Homestead Grant was a grant of fee. It was not a grant of a license or a limited use. It was a grant of fee. It's also, and Judge Basker pointed up to us with a wonderful question that he asked us to respond on in the Court of Federal Claims. What was the import of the term railroad company as used in the 1875 Act? And clearly that's very important. I have, for example, right here, the Union Pacific Act of 1862. There it is. That is the corporate charter of Union Pacific Railroad. This all happened before the late 1890s and early 20th century development of the broad New Jersey and then Delaware Corporation. These were not broad gauge corporations. These were railroad companies. I think, was it the C&O once owned the Greenbrier? But you're saying 1875, that wasn't the case for a railroad company? No. They didn't own entertainment companies. Railroads bought property and built sort of end of the trolley line amusement park type things except on a grand scale. The Greenbrier, the Broadmoor, Sun Valley, all of these were manifestations, I think, of the dreams of the tycoons who built the system, a place where they could go hunting or play golf with their buddies and so forth. But the Hash case did look at all of this. I mean, all of these things are in, I really think that Judge Newman has been unfairly portrayed. Her opinion is a wonderful opinion. You think she didn't make a hash of the law? No, she did not. She did not. It's ours. It's the whole court. So we have to look at what we have done. Do I have any time? Let's hear from Ms. Barton. Thank you very much. A little extra time, just like David was telling us, some extra time. So I think the court understands our argument. I would like to note that there really are significant questions to be addressed. These are the first... I don't quite understand it. I mean, his point was that this is a matter of law. Now, what more do you want to do specifically? We want to argue... A matter of law that's already been decided. But it hasn't been decided. It hasn't been decided as fully as you'd like it to be. We would like to have... A lot of things that should have been written, but that can be said about any opinion. What is it specifically that you would... Can you give us three things, maybe, that you want to go back and try to prove? Yes. Yes, we want to prove that the 1875 Act rights of way are broad enough to encompass trail use and or rail banking. We want to... There are two provisions, at least in that statute, that we can rely on for that proposition. We want to argue that Congress's subsequent statutes allowing for conveyance of these rights of way by the railroad to transportation departments recognizes the breadth of those rights of way. And we want to be able to argue that in cases where the patent was made after... Even if those arguments are rejected, after Congress changed the law, that different background principles apply, that those easements may have been expanded later on. And those are the arguments with regard to scope. I would like to note that Hatch actually does not even purport to address the scope of the easement. Hatch says, if you read it to hold the United States liable, that on abandonment, the land was disencumbered of the easement. At that point, if we had put a railroad back on, it would have been a taking. Hatch does not even purport to address scope. So scope, you can't even read Hatch, even if you read it against the way we would like it read, as having held that. The United States does stand to be liable for hundreds or maybe thousands of takings claims as a result of these federally granted rights of way, in which, frankly, I think it is hard to imagine that Congress intended them only to give up a valuable public piece of land to just disappear when a new conveyance came along. It's clear that the purposes of that right of way to serve the opening of the West, the commerce of people out there, the communities, that it would disappear and have to be reacquired later on for billions of dollars if it was needed for roads, if it was needed for bicycles, if it was needed for light rail. Those are the kinds of arguments that we would like to be able to make on remand. I guess back in those days, they had those funny looking bikes. The big front wheel and the little back wheel, right? Yeah, well, we will try on remand to find a picture of one that was on an 1875 Act right of way. Thank you, Your Honor. Thank you. The case is submitted.